128 S.W.3d 707 (2004)
In the Interest of D.C., A.C., and H.M.
No. 2-03-085-CV.
Court of Appeals of Texas, Fort Worth.
January 29, 2004.
*710 Michael Berger, Fort Worth, for Appellant.
Tim Curry, Criminal District Attorney, Charles M. Mallin, Michael R. Casillas, Melissa Paschall, Assistant Criminal District Attorneys, Fort Worth, for State.
Kerry L. Owens, for D.C., A.C., and H.M.
PANEL A: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

OPINION
TERRIE LIVINGSTON, Justice.

INTRODUCTION
In this termination of parental rights case, M.M., the mother of D.C., A.C., and H.M., appeals the trial court's judgment terminating her parental rights and the parental rights of Beau Unknown.[1] In three issues, appellant complains that the citation by publication as to Beau Unknown was defective due to an incorrect answer date in the citation, due diligence was not used to locate Beau Unknown, and the evidence was insufficient to support the trial court's decision to terminate appellant's parental rights. We affirm.

FACTS
Texas Department of Protective and Regulatory Services (TDPRS) investigated appellant in 1999 for allegations of physical abuse against A.C. and D.C. TDPRS first investigated appellant because D.C. was taken to the hospital with bruises and a genital rash. In response to a referral from D.C.'s hospital visit, TDPRS investigator Crystal Clay visited the children on June 2, 1999. They were dirty, but she did not observe any hazards in the home.
Two months later, TDPRS received another referral alleging physical neglect and neglectful supervision. In response, TDPRS investigated appellant again after the police found D.C., who was two at the time, wandering down the street alone at three a.m. The police returned the child to her home and became seriously concerned when they saw the condition of the trailer where appellant and the children lived.
Clay visited the trailer again and noted that it was very dirty and cluttered, with filthy, matted carpet and bits of food and trash lying around in reach of the children. Appellant promised Clay that she would put locks on the doors so that D.C. could not open them.
*711 When Clay returned four days later she found a padlock on the front door, which led her to believe appellant and her family had been evicted. Clay eventually found appellant and her children living at another trailer in the same trailer park. A.C., who was barefoot and clothed only in a dirty diaper, was outside by herself among a junkyard of broken toys, parts of a crib, a bike, and broken furniture. D.C. and A.C. were both covered in dirt and lice, both children had pus coming out of one of their ears, and their hair was matted.
Inside the trailer, Clay discovered conditions that were dangerous for the children, such as a stereo connected to a car battery in reach of the children. Additionally, appellant admitted to having illegal drugs in the home and Clay found the drugs stored in a place where D.C. had access to them. During the visit, appellant threw something at Clay, who called the police. The officers on the scene arrested appellant for disturbing the peace. TDPRS removed the children and placed them in foster care. Appellant's mother was named managing conservator of the children, but she allowed the children to live with appellant.
TDPRS received another referral on January 17, 2002, alleging that J.C. and appellant were using drugs and had an unstable home situation, and that the children were physically abused. TDPRS investigator Monica Dixon had difficulty locating them, but finally found appellant, J.C., D.C., and A.C. on January 30, 2002, living at an apartment in North Richland Hills.[2] The investigation that day revealed that both D.C. and A.C. were infested with lice, but otherwise appeared to be clean. Dixon talked to the children, and both told her that they had been punished by appellant and J.C., who spanked them with a spoon, a belt or a hand. A.C. had bruises on her body, but claimed that she got them from her sister when they were playing. Additionally, when Dixon asked the girls if they got enough to eat, D.C. told her that they did not eat at night. Dixon also spoke to appellant and J.C., who both admitted taking illegal drugs approximately two weeks before. Appellant told Dixon that J.C. had physically abused her in the past. D.C. told Dixon that she had seen her parents fighting.
While this investigation was still open, another referral came in on March 31, 2002 concerning appellant and her children. This time, TDPRS assigned the case to investigator Bron Gose. The referral alleged that appellant and J.C. physically abused D.C. and H.M. and that D.C. had large bruises on her bottom. The same night, the children were placed with J.M.'s mother pursuant to a voluntary TDPRS safety plan. The following day, Gose visited the children. He saw that D.C. had a six-inch bruise across her buttocks. Photographs of the bruises were admitted at trial.
When Gose interviewed the children, D.C. stated that J.C. gave her the bruise because he was frustrated when she could not find his "pot." A.C. corroborated the "pot" story, but the children were unable to elaborate further on their familiarity with "pot." Previously, appellant and J.C. both admitted to taking illegal drugs. Appellant also admitted to habitually using drugs since she was seventeen years old. Both D.C. and A.C. stated that they were afraid of J.C. and that he hit appellant in the mouth. A.C. told Gose that J.C. had also punched H.M. in the stomach; however, *712 there was no bruising or evidence of injury on H.M.
Based upon his visit with the children, Gose feared for the children's safety and determined that it was in their best interest to have them removed from appellant's and J.C.'s care. Additionally, Gose feared that if the children were given to appellant's mother she would just return them to appellant. On April 19, 2002, Gose attempted to meet with appellant and J.C. at their home, and they refused to let him in. Instead, they spoke outside in front of the residence.
It is clear from the record that J.C. had a propensity for violence. The record also reflects that appellant allowed her children to be repeatedly exposed to J.C., whom she knew possessed a violent nature. Appellant herself admitted that J.C. physically abused her. D.C. told TDPRS that she had seen her parents fighting. Both D.C. and A.C. stated that J.C. hit appellant in the mouth. At least twice, J.C. had physically abused appellant, and his actions resulted in criminal convictions. A.C. matter-of-factly described one incident where J.C. struck appellant in the face, split her lip, and caused her to bleed profusely.
On April 9, 2002, TDPRS filed a petition to terminate the parent-child relationship between three minor children, D.C., A.C., and H.M., and their mother, M.M., and fathers J.C. (father of D.C. and A.C.), and J.M. (alleged father of H.M.). During trial, DNA evidence showed that J.M., was not H.M.'s biological father and the court adjudicated him not to be the father of H.M.
After DNA testing revealed that J.M. was not the father of H.M., TDPRS amended its petition to reflect that in addition to the above, it also sought to terminate the parental rights of Beau Unknown, or Bo Unknown, who was found to be the alleged biological father of H.M. The full, accurate name and whereabouts of the actual father of H.M. were unknown.
The trial court held that appellant had knowingly placed her children in situations and engaged in conduct that endangered their physical or emotional well-being. The court also held that termination of the relationship was in the children's best interest. Accordingly, the trial court ordered that appellant's parental rights be terminated. Additionally, the court found that due diligence had been used to identify, locate, and serve Beau Unknown, but that he could not be located. Beau Unknown was served by publication, but failed to answer, or appear. The court appointed an attorney ad litem to represent Beau Unknown's rights at trial. The court found that termination of Beau Unknown's parental rights with regard to H.M. was in the child's best interest. Consequently, the court also terminated the parent-child relationship between Beau Unknown and H.M.

DISCUSSION
In her first two issues, appellant seeks reversal of the trial court's termination of Beau Unknown's parental rights. First, appellant argues that citation was defective as to Beau Unknown because the citation by publication stated an incorrect answer date. Second, appellant contends that reversal is required because due diligence was not used to locate and personally serve Beau Unknown.
The family code provides for citation by publication as in other civil cases. Tex. Fam.Code Ann. § 102.010(a) (Vernon Supp. 2004). We agree with appellant that a party must be given until the Monday following the expiration of forty-two days from the date of publication to answer or appear before the court. See Tex.R. Civ. P. 114. Additionally, we agree with appellant *713 that due diligence must be used to locate a missing biological parent in a termination proceeding before service by publication is proper.[3]See Tex. Fam.Code Ann. §§ 161.002(b)(2), 161.107 (Vernon 2002); see also Tex.R. Civ. P. 109.
Regardless of whether some evidence exists in this case to show that citation as to Beau Unknown may have been defective or that due diligence may not have been used to locate him,[4] appellant lacks standing to challenge the termination of Beau Unknown's parental rights. In re P.R., 994 S.W.2d 411, 416-17 (Tex. App.-Fort Worth 1999, pet. dism'd w.o.j.) (holding that a mother lacked standing on appeal to challenge termination of alleged father's parental rights), disapproved of on other grounds by In re J.F.C., 96 S.W.3d 256, 267 & n. 39 (Tex.2002); see also In re B.B., 971 S.W.2d 160, 163 (Tex.App.-Beaumont 1998, pet. denied), disapproved of on other grounds by In re C.H., 89 S.W.3d 17, 26 (Tex.2002) (holding that mother could not appeal the termination of the parental rights of father who did not appeal himself). On appeal, a party may not complain of errors that do not injuriously affect her or that merely affect the rights of others. See Buckholts ISD v. Glaser, 632 S.W.2d 146, 149-50 (Tex.1982); Hanna v. Godwin, 876 S.W.2d 454, 457 & n. 5 (Tex. App.-El Paso 1994, no writ) (listing cases reflecting this rule).
Appellant has failed to explain how the termination of Beau Unknown's parental rights would injure or affect her own.[5] Additionally, Beau Unknown has not brought his own appeal. Therefore, appellant lacks standing on appeal to complain of errors affecting the rights of Beau Unknown. Because appellant lacks standing on appeal to challenge the termination of Beau Unknown's parental rights, we overrule appellant's first and second issues.

Legal and Factual Sufficiency
In her third issue, appellant contends that the evidence is legally and factually insufficient to support the trial court's determination that TDPRS established one or more of the grounds for termination alleged in its petition and that termination of appellant's parental rights was in the children's best interest.
*714 A parent's rights to "the companionship, care, custody and management" of his or her children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." C.H., 89 S.W.3d at 26. In a termination case, the State seeks not just to limit parental rights but to end them permanentlyto divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp.2004); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. Holick, 685 S.W.2d at 20-21; In re D.T., 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g).
In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); Richardson v. Green, 677 S.W.2d 497, 499 (Tex.1984); Swate v. Swate, 72 S.W.3d 763, 766 (Tex. App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987).
Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." Tex. Fam. Code Ann. §§ 161.001, 161.206(a); In re G.M., 596 S.W.2d 846, 847 (Tex.1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. G.M., 596 S.W.2d at 847; D.T., 34 S.W.3d at 630. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.
The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review. J.F.C., 96 S.W.3d at 265. The traditional no-evidence standard does not adequately protect the parent's constitutional interests. Id. In reviewing the evidence for legal sufficiency in parental termination cases, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. Id. at 265-66. We must review all the evidence in the light most favorable to the finding and judgment. Id. at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. Id. We must also disregard all evidence that a reasonable factfinder could have disbelieved. Id. We must consider, however, undisputed evidence even if it does not support the finding. Id.
The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review. *715 C.H., 89 S.W.3d at 25. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." Id. In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. Id. Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. Id. at 28.
In its petition, the TDPRS requested that appellant's parental rights be terminated because termination was in the children's best interest and appellant had violated family code sections 160.001(D) and (E) by:
knowingly plac[ing] or knowingly allow[ing] the children to remain in conditions or surroundings [that] endanger[ed] the physical or emotional well-being of the children;
engag[ing] in conduct or knowingly plac[ing] the children with persons who engaged in conduct [that] endangers the physical or emotional well-being of the children;
The trial court terminated appellant's rights and found that appellant had committed the acts or omissions alleged in TDPRS's petition.

ANALYSIS
We first review the evidence supporting the trial court's findings that appellant knowingly placed her children or knowingly allowed them to remain in conditions or surroundings that endangered their physical or emotional well-being and that appellant engaged in conduct, or knowingly placed her children with others who engaged in conduct, that endangered the physical or emotional well-being of the children. See Tex. Fam.Code Ann. § 161.001(1)(D), (E). Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. In re B.S.T., 977 S.W.2d 481, 484 (Tex.App.-Houston [14th Dist.] 1998, no pet.), disapproved of on other grounds by C.H., 89 S.W.3d at 25. Under subsection (D), the environment, including the environment produced by the parent's conduct, is the source of endangerment to the child. In re W.S., 899 S.W.2d at 776. Under subsection (E), the danger to the child is a result of the parent's conduct, including the parent's actions or omissions or failures to act. Id. at 778; In re R.D., 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied); Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.-Dallas 1995, no writ). However, termination under section 161.001(1)(E) requires more than a single parental act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. In re K.M.M., 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.); In re J.N.R., 982 S.W.2d 137, 142 (Tex.App.-Houston [1st Dist.] 1998, no pet.), disapproved of on other grounds by C.H., 89 S.W.3d at 24-25. Both subsections require knowledge on the part of the parent. J.N.R., 982 S.W.2d at 142.
Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. See W.S., 899 S.W.2d at 776-77; Ziegler v. Tarrant County Child Welfare Unit, 680 S.W.2d 674, 678-79 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.). Illegal drug use and drug-related criminal activity by parents and caregivers *716 also supports the conclusion that the children's surroundings endangered their physical or emotional well-being. See In re S.D., 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied).
The evidence concerning these two statutory grounds for termination is interrelated, thus, we consolidate our review of the evidence supporting these findings. See id. at 762; In re B.R., 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied) (both recognizing link between parent's conduct and child's conditions and surroundings). The record contains ample evidence to support the findings under subsection (D) (environmental endangerment) and subsection (E) (course of conduct endangerment of the physical or emotional well-being of the children). The evidence of J.C.'s violence, abuse of appellant and the children, illegal drug use, and neglect, and the evidence of appellant's acquiescence to the children's exposure to drug use and family violence constitutes more than a scintilla of evidence to support the trial court's finding that appellant knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being. Additionally, appellant's admitted continued drug abuse, her knowledge of J.C.'s violent tendencies, and neglect of her children constitute sufficient evidence to support the finding that appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. We hold that the evidence is legally and factually sufficient to support the first prong of the trial court's findings under family code section 161.001(1)(D) and (E).
Best Interest
In addition to presenting sufficient evidence under sections (D) and (E), the termination of the parent-child relationship must also be supported by evidence to show that it is in the best interest of the children. Tex. Fam.Code Ann. § 161.001(2). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:
(1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best interest of the child;
(6) the plans for the child by these individuals or by the agency seeking custody;
(7) the stability of the home or proposed placement;
(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent.
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. C.H., 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children. Id. On the other hand, the presence of scant evidence relevant to each Holley factor will not support such a finding. Id.
Appellant contends that the evidence was legally and factually insufficient to support the trial court's conclusion that termination of her parental rights was in *717 the best interest of the children. She contends that little or no evidence was presented at trial regarding: (1) the current and future desires, or emotional and physical needs of the children; (2) the current and future emotional and physical dangers to the children; (3) the parent's acts or omissions that may be indicative of an unhealthy or improper parent-child relationship; (4) any excuses for that parent's acts or omissions; (5) the parental abilities of the persons seeking custody; and (6) the stability of the home or proposed placement. Moreover, she contends that several of these factors contradict the finding that termination is in the children's best interest. Specifically, appellant focuses on factors six and seven and argues that TDPRS has not secured an adoption commitment from the foster parents and that TDPRS has acted in a contradictory manner by indicating that it might allow J.M.'s mother to adopt the children. She argues that placement of the children with J.M.'s mother is not feasible since the children were already removed from her care due to "disruptions."
The State argues that ample grounds exist to support the finding that termination is in the children's best interest. The State points to the testimony of Dr. Williams, who stated that it was critical that appellant cease using drugs in order to be an effective parent. Williams stated that he would only recommend reunification of this family if appellant fully complied with the drug rehabilitation program he recommenced for her. Appellant waited to begin the drug treatment program until the day she appeared at the trial court. She testified that she was checking into the drug treatment program that day "[t]o look good to you all [the court] so you wouldn't be questioning me on why I didn't do it." From this testimony, the trial court, acting as the trier of fact and arbiter of witness credibility, was not required to find her testimony or commitment to drug rehabilitation credible. See In re A.C., 758 S.W.2d 390, 394 (Tex.App.-Fort Worth 1988, no writ). Additionally, the evidence that appellant failed to comply with the requirements of the service plans designed for her and that she had not attended to her children's educational and health needs is additional evidence to support the finding that termination was in the children's best interest.[6] Overall, appellant's home life was unstable as evidenced by the fact that in the year preceding trial, appellant had moved eight times.
Once in foster care, the children's development improved dramatically. After visits with appellant and J.C., however, the children's behavior regressed and was uncontrollable. Investigators noted that the children seemed happier in foster care.
Taken together, appellant's inability to provide a stable home, remain gainfully employed, and her failure to comply with the service plans and successfully complete drug treatment all support the trial court's finding that termination was in the children's best interest. Accordingly, we hold that the evidence was legally and factually sufficient to support the termination of appellant's parental rights.
Having overruled all of appellant's issues, we affirm the trial court's order terminating appellant's parental rights regarding A.C., D.C., and H.M.
NOTES
[1] At trial, J.C., the father of D.C. and A.C., voluntarily relinquished his parental rights to both of his children. DNA testing revealed that J.M., the alleged father of H.M., was not the father of H.M. An unknown man, referred to as Beau Unknown, was the actual father of H.M.
[2] H.M. had been born by this time, but was staying with J.M.'s mother, on the day Dixon visited. H.M. stayed at J.M.'s mother's house on and off. Additionally, although appellant's mother, had been appointed permanent managing conservator of D.C. and A.C. in a prior TDPRS case, she usually left the children in the care of appellant and J.C.
[3] Section 161.107(b), (c) states:

(b) If a parent of the child has not been personally served in a suit in which the Department of Protective and Regulatory Services seeks termination, the department must make a diligent effort to locate that parent.
c) If a parent has not been personally served and cannot be located, the department shall make a diligent effort to locate a relative of the missing parent to give the relative an opportunity to request appointment as the child's managing conservator.
Tex. Fam.Code Ann. § 161.107(b), (c).
[4] No one attempted to find Beau Unknown even though appellant testified that she thought his name was Beau Purdham or Burdham and stated that she had given this information to the TDPRS worker. J.C. testified that Beau Unknown was a friend of his brother who lived in Odessa or Midland, Texas and worked at the Super Wal-Mart. Beau and J.C.'s brother had both worked at the Wal-Mart in Lake Worth in 2000. During J.C.'s testimony, he stated that he last heard that Beau Unknown was in Alabama.
[5] Appellant does not argue that Beau Unknown was a necessary party and that defective service of citation on him therefore rendered the trial court's order void. See Berry v. City of Fort Worth, 132 Tex. 599, 124 S.W.2d 842, 846 (1939) (holding that trial court lacks jurisdiction over a party who is not served by citation); see also Simms Oil Co. v. Butcher, 55 S.W.2d 192, 194 (Tex.Civ. App.-Dallas 1932, writ dism'd) (holding that judgment can be void if the trial court lacks jurisdiction over a necessary party). We note that Beau Unknown was represented by an attorney ad litem who appeared on his behalf and questioned witnesses at trial, rendering this argument inapplicable.
[6] D.C. had to repeat kindergarten because appellant had not enrolled her in school while D.C. was in her care. A.C. had previously been diagnosed with cataracts, which could have permanently damaged her eyesight without treatment, but appellant delayed treating the condition until August 2002 after TDPRS got involved in the case.