

# NUMBER 13-18-00319-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

## IN THE INTEREST OF J.T.T.J., K.A.T. AND R.D.R.T., MINOR CHILDREN

---

**On appeal from the 25th District Court
of Gonzales County, Texas.**

---

# MEMORANDUM OPINION
### Before Justices Rodriguez, Contreras, and Benavides
### Memorandum Opinion by Justice Benavides

Appellant S.T. (Mother) challenges the legal and factual sufficiency of the evidence

supporting the termination of her parental rights to her children, J.T.T.J. (Child 1), K.A.T.

(Child 2), and R.D.R.T. (Child 3).[1]  Mother also claims the trial court should not have

---

[1]  To protect the identity of minor children, we will utilize aliases for the children and refer to the parents as Mother and Father.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West, Westlaw through 2017 1st C.S.); TEX. R. APP. P. 9.8(b)(2).  Although the trial court terminated both parents' parental rights, Mother is the only parent to appeal the trial court's judgment.  Therefore, this Court will only discuss the trial court's judgment as it pertains to Mother.

considered the record from her trial before an associate judge in making his determination to terminate her parental rights.   We affirm.

## I.   BACKGROUND

### A.   Procedural History

The Department of Family and Protective Services (the Department) filed its petition for protection and termination of Mother and father J.T.'s parental rights in October of 2016.   Following a hearing, on October 10, 2017, Associate Judge Thomas Stuckey recommended an order that both parents' rights be terminated.   *See* TEX. FAM. CODE ANN. § 201.308 (West, Westlaw through 2017 1st C.S.).

Mother filed her request for a de novo trial to be conducted either in front of a jury or the district judge on October 11, 2017.   During a hearing held in late October 2017, District Court Judge William Old found that Mother was not entitled to a de novo trial in front of a jury and noted her objection to a trial including the transcript from the proceeding before the associate judge.[2]

After reviewing the transcript, in November 2017, Judge Old remanded Mother's case back to the associate judge because he determined the Department failed to demonstrate that termination was in the children's best interest.   Judge Old gave Mother a six-month extension to comply with the Department's service plan.

In February 2018, Mother filed a request for a de novo hearing regarding Judge Stuckey's denial of her request for a jury trial based on the fact it was untimely.   Judge

---

[2]   The Department argued that Mother's request for a jury trial was (1) a violation of the pretrial scheduling order that had been rendered the previous year; (2) untimely under Rule 216 of the Texas Rules of Civil Procedure because it was not filed 30 days prior to the final hearing date; and (3) improper because jury demands are pre-trial motions, not post-trial motions.

Old held a hearing and denied Mother's demand for a jury trial.

In March 2018, a new trial was held before the associate judge. Following its conclusion, Judge Stuckey found that Mother violated family code sections 161.001(b)(1)(D), (E), and (O), and that termination of Mother's parental rights was in the best interests of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), & (b)(2) (West, Westlaw through 2017 1st C.S.).

Following Mother's request for a de novo trial, the proceeding was held in front of Judge Old in May 2018. During the trial, the Department put on evidence from the Department's case worker and court appointed special advocate volunteer regarding a change in placement for Child 2 that had occurred following the March 2018 trial. Judge Old reviewed the testimony and took the transcript from the prior trial into consideration, agreed with Judge Stuckey's determination, and ordered the termination of Mother's parental rights.

## B.    Trial Testimony Before Associate Judge

During the trial before Judge Stuckey, the Department put on multiple witnesses who testified about the allegations regarding Mother.

Daniel Buyer, an investigator with the Department, followed up on allegations of medical neglect, neglectful supervision, and sexual abuse involving Child 1, Child 2, and Child 3. Father was a registered sex offender, shared a home with Mother and the children, and Mother left the children with Father alone. Investigator Buyer stated that when he spoke with Mother regarding the allegations of sexual abuse of Child 3, her response to him was, "I was sexually abused. I got over it. She'll get over it too." He felt Mother lacked the appropriate attitude toward protecting her children and was more

3

concerned with her own life.

Officer Eric Jones of the Waelder Police Department also testified regarding an allegation where Child 3 was found almost unconscious on the side of the road. Officer Jones stated the children had been left unsupervised. Officer Jones was present at two child advocacy center (CAC) interviews with Child 3 and heard Child 3 state that Father and a neighbor had touched her inappropriately. Officer Jones explained the difference in Child 3's appearance following her removal from Mother's custody: the children had previously been unkempt and not dressed appropriately and now Child 3 was tidy and dressed appropriately.

Deane Novosad, a forensic interviewer and program coordinator at the Gonzales Regional Children's Advocacy Center, interviewed the children. Novosad explained that Child 3 made an outcry of sexual abuse by Father and gave her specific details of what occurred. Child 3 also told her that Mother was aware of the sleeping arrangements in the home, where Father shared a bedroom with the children and shared a bed with Child 3. Novosad stated on cross-examination that Child 3 had been interviewed twice and had made an outcry of abuse during the second interview. The other children were not interviewed a second time, even though Novosad requested a second interview with each child from the Department.

Kim Wilgus is Child 1's counselor at the Bluebonnet Youth Ranch. She stated that during her counseling sessions with Child 1, he was guarded and protective of his family and siblings, and he did not understand why the children were in the Department's care. Wilgus testified that she saw a change in Child 1's behavior following visits with Mother and she felt he shut down or acted out following the visits. According to Wilgus,

4

although Child 1 loves Mother, he did not state he wanted to live with Mother, and Wilgus believed it was in Child 1's best interest if he did not return to Mother.

Noella Hill, the sexual assault examination nurse, examined all three children. Hill explained that she examined Child 3 twice, once with what she considered an abnormal exam, and the second exam being deemed normal. Hill stated that Mother did not want counseling for the children and told her that she "wanted them to forget everything." Although Hill agreed that Mother informed her that Child 3 had some medical conditions, Hill believed, based on the circumstances of the case, there could be a conclusion of abuse of Child 3.

The final two witnesses for the Department were Kendra Leazer, the Department caseworker, and Esther Mitchell, the court appointed special advocate (CASA) volunteer. Both women had been involved with the children for the entirety of the case.

Leazer testified that she had prepared the family service plan in October 2016. Mother completed parts of the plan successfully but failed to complete many of the requirements in what was deemed a "timely manner." Due to Mother's partial compliance, the referring court allowed Mother an additional six months following the first recommendation of termination to comply with the conditions of the plan. According to Leazer, Mother refused to discuss the case in the court-ordered counseling, refused to allow the Department to conduct monthly home visits, never provided documentation of her income, did not provide information regarding a family placement for the children, missed some of the scheduled visitations with the children, and was difficult in her communications with the Department. Leazer stated she did not believe Mother took the situation seriously, found Mother to have a lack of protective capacities, and seemed

5

to lack engagement with the children once her fourth child was born. Leazer explained to the court that the older children had expressed a desire to be returned to Mother but were okay if they could not be as long as the siblings were able to stay together. Child 3 did not express her wishes to Leazer but was very attached to her foster family and expressed wanting to stay with them. Child 3 also developed the same medical issues she previously displayed before and after visits with Mother.

Mitchell stated the children were good children and wanted to be together. Mitchell witnessed the visitations and saw that Mother was initially very involved, planned activities for the children, and brought them treats. Mitchell felt that after the fourth child was born, Mother's emphasis changed and her focus, even during visitations, was on the baby. Mitchell explained to the court that she does not believe Mother is capable of or willing to handle the psychological issues each child has.

Mother also testified. She explained that she was a high school graduate and is taking college classes online. Mother told the court that she felt she complied with the court orders "under her constitutional rights." Mother and her current boyfriend own a security company, but she refused to go into greater detail, stating questions needed to be directed to the boyfriend. Mother stated that she was living in a two-bedroom, one-bathroom apartment, but intended to buy a home. She felt the current living arrangements were suitable for the children and that she could provide for her children. Mother also believed that Child 3's issues could be addressed at home and fixed and that Child 2 did not exhibit any of the psychological issues when Mother had custody of the children. Mother refused to discuss any of the counseling sessions or incidents involving Father, invoking her Fifth Amendment right against self-incrimination. Mother claimed

6

she was not aware of the sleeping arrangements when Father lived with her and the children, although she admitted her trailer only had two bedrooms and neither Father or the children slept in her bedroom.

Following the trial, Judge Stuckey recommended termination of Mother's parental rights. The de novo hearing was held, and Judge Old terminated Mother's parental rights. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

By what we deem to be her first issue, Mother alleges there was legally and factually insufficient evidence presented at trial to support the trial court's findings and to terminate her parental rights.

### A. Standard of Review and Applicable Law

A court may order the termination of a parent-child relationship if it is shown by clear and convincing evidence that a parent has met at least one of the statutory factors listed in section 161.001 of the family code, coupled with an additional finding by clear and convincing evidence that termination is in the child's best interest. *See id.* § 161.001(b)(1)–(2); *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002) (noting the two-prong test in deciding parental termination and that one act or omission of conduct satisfies the first prong); *In re E.M.N.*, 221 S.W.3d 815, 820–21 (Tex. App.—Fort Worth 2007, no pet.). "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2017 1st C.S.). "This intermediate standard falls between the preponderance of the evidence standard in civil proceedings and the reasonable doubt standard of

7

criminal proceedings." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.). This heightened standard of review is mandated not only by the family code, *see* TEX. FAM. CODE ANN. § 161.001, but also the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)). "It is our obligation to strictly scrutinize termination proceedings and strictly construe the statute in favor of the parent." *In re L.J.N.*, 329 S.W.3d at 673.

In a legal sufficiency review, we look at all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We "must consider all of the evidence, not just that which favors the verdict." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Furthermore, we must assume that the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266. If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient and render judgment in favor of the parent. *Id.*

In reviewing challenges to factual sufficiency, we should "inquire 'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [] allegations'" from the entire record. *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that

8

a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* However, in applying this standard, we must not be so rigorous in our analysis that the only fact findings that could withstand review are those established beyond a reasonable doubt. *Id.*

## B. Discussion

The trial court found that termination was appropriate under section 161.001(b)(1)(D), (E), and (O), and was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), & (b)(2). Because termination is sufficient if one of the factors and best interests are found, we will discuss section 161.001(b)(1)(E). *See id.* § 161.001(b)(1)(E).

### 1. Section 161.001(b)(1)(E)

Section 161.001(b)(1)(E) requires a showing that "the parent has: (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* Under subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Instead, endanger means to expose the child to loss or injury or to jeopardize his emotional or physical well-being." *Id.* The trial court must determine whether "evidence exists that the endangerment of the child's physical well-being was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied). "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's

9

course of conduct creates a potential danger which the parent is aware of but disregards." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see In Interest of R.S.-T.*, 522 S.W.3d 92, 109–10 (Tex. App.—San Antonio 2017, no pet.) (regarding what the trial court can consider under subsection E for termination).

Termination under subsection 161(b)(1)(E) "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Courts can consider conduct that did not occur when the child was present, including conduct before birth or after the child was removed from the parent's care. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The trial court found Mother committed conduct endangering the emotional well-being of Child 1, Child 2, and Child 3. Mother knowingly allowed Father, a registered sex offender, to reside in her two-bedroom home with the children. Although Father's probation conditions allowed him to see his children, Mother frequently left the children alone with Father. Additionally, Father shared a bedroom with the three children, and according to statements made by the children, he shared a bed with Child 3. Child 3 made an outcry of sexual abuse against Father and stated Mother knew about the abuse. During her testimony in front of the associate judge, Mother stated she had no knowledge that Father shared a bed with any of the children. However, on cross-examination, Mother admitted her home only had two bedrooms, Father did not share her bedroom, and Father did share the bedroom with the children. Other testimony showed that Mother did not seem to take the outcry of sexual abuse by Child 3 seriously when she

told Investigator Buyer that Child 3 "would get over [the abuse]."

Based on Child 3's statements and Mother's admissions, the trial court's finding under section 161.001(b)(1)(E) that Mother placed all three children in an environment that could endanger their physical or emotional well-being is supported by legally and factually sufficient evidence. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

### 2. Best Interest of the Child

We must next determine whether there was clear and convincing evidence that termination of Mother's parental rights is in the children's best interests. *See id.* § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 261. We must decide how to "reconcile 'a parent's desire to raise [the] child with the State's responsibility to promote the child's best interest.'" *In re O.R.F.*, 417 S.W.3d 24, 39 (Tex. App.—Texarkana 2013, pet. denied) (citing *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012)). "There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome that presumption." *Id.* "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In deciding what is in the "best interest of the child," we look to the following factors: The *Holley* factors include, but are not limited to:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In the Interest of B.R.*, 456 S.W.3d 612, 615–16 (Tex. App.—San Antonio 2015, no pet.) (quoting *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). "These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate." *In re D.C.*, 128 S.W.3d 707, 716 (Tex. App.—Fort Worth 2004, no pet.). "Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children." *Id.* "On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding." *Id.* "Additionally, the Family Code lists thirteen similar factors for determining the parents' willingness and ability to provide a safe environment." *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.— Houston [14th Dist.] 2003, no pet.) (citing TEX. FAM. CODE ANN. § 263.307 (West, Westlaw though 2017 1st C.S.)).

**(a)      the desires of the child**

Although there was testimony that the children loved Mother, the children were more concerned with the siblings staying together than with their return to Mother. Child 1 and Child 2 both expressed to Leazer a desire to return home but stated they would be okay not being returned to Mother as long as they remained together or with Child 3. Child 3, as the youngest, felt safe in her foster home, told her foster mother she loved her in front of Mother, and even at one point asked to live with Leazer instead of Mother. The children's bond was with each other and less so with Mother. Their requests to stay together shows what they felt was most important. Being reunited with Mother was not their main concern. This factor weighs in favor of termination.

**(b)    the emotional and physical needs of the child now and in the future**
**(c)    the emotional and physical danger to the child now and in the future**

The emotional and physical needs of the children are of paramount concern. The trial court can consider past events in making the determinations of best interest. *See May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) (explaining that evidence of past misconduct or neglect is a permissible inference that a parent's future conduct may be measured by their past conduct).

Child 1 was seemingly the most stable, as well as the oldest child. The evidence before the court showed that Child 1 made exceptional grades, was involved in community and extracurricular activities, seemed well-adjusted in his placement environment and school, and loved his sisters. Testimony from his counselor showed that he was very guarded and protective when the family situation was discussed. Wilgus believed he shut down and acted out some after visitations with Mother and showed anger when Mother did not come to visits. Additional observation by Mitchell and Leazer showed that Child 1 was protective of his sisters and took on a parenting role when he was around them, sometimes even more so than Mother.

Child 2 had a difficult adjustment going into placement due to her behavior and was moved to different inpatient facilities throughout the pendency of this case. Allegations arose at the beginning of the case that Child 2 displayed signs of cutting behaviors. The evidence showed Child 2 needed strict, structured, inpatient care to deal with her psychological and behavioral issues. Mitchell testified that she stayed in contact with Child 2 and tried hard to help her improve her low self-esteem while she was in different facilities. Child 2 had a good relationship with her siblings and seemed to enjoy

13

the time with them as expressed in the testimony. Mother, however, stated during her testimony that Child 2 never had any behavioral or psychological issues before she was removed. Mitchell expressed to the court that, based on her observations, that she did not believe Mother would be willing or capable of handling any of the children's psychological issues.

Child 3 suffered from both physical and emotional issues. Child 3 made an outcry that she was sexually abused by Father and a neighbor. In addition, she experienced bladder issues prior to and during placement. Testimony showed that Child 3's bladder issues during placement seemed to coincide with visitations scheduled with Mother. Child 3 also experienced behavior changes following the visitations. Child 3 attended counseling sessions, at least weekly, to work on behavior modifications.

All three children required counseling sessions to help them be successful in their daily life. Mother refused to comply with her court-ordered counseling sessions and seemed to discount that the children had any sort of psychological issues prior to their removal. Because the children would need to continue on this course of treatment and Mother seems unwilling to accept her own required counseling, the children's physical and emotional needs would most likely not be met if they were returned to Mother. Mother placed them in situations prior to removal that endangered them tremendously, both emotionally and physically, and would likely do so again in the future if the children were returned to her. These factors weigh in favor of termination.

> **(d)**     **the parental abilities of the individuals seeking custody**
> **(e)**     **the programs available to assist these individuals to promote the best interest of the child**
> **(f)**     **the plans for the child by these individuals or by the agency seeking custody**

14

**(g)     the stability of the home or proposed placement**

"A child's need for permanence through the establishment of a 'stable permanent home' has sometimes been recognized as the paramount consideration in a best-interest determination."   *In re J.I.T.P.,* 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.).   "Therefore, evidence about the present and future placement of the children is relevant to the best-interest determination."   *Id.*

The children are currently split between three placements as a temporary solution. The children have expressed a desire to be placed together.   Testimony from Leazer shows the Department has a viable family member who was interested in adopting all three children together.   Leazer also stated that the Department's ultimate goal was family placement, and if that was not possible, it would require any non-family adoption to consider the children as a unit.

Currently, the children were placed in places they could remain until a more suitable alternative was found.   Additionally, if the children could not all be placed together, Leazer felt Child 3's foster mother was interested in adopting and making Child 3's placement permanent for her.   Child 2 needed additional structure and care in a treatment facility, and the foster home Child 1 was in could keep him long-term.

Mother, however, was residing in a two-bedroom, one-bathroom apartment with her boyfriend and newborn child.   She felt the apartment was sufficiently large enough to accommodate a family of six persons.   Mother testified that she had substantial income, and was considering purchasing a home, but had not done so yet.   Mother also did not comply with court orders to provide the Department with any family or community resources that could help her with the children.

15

Based on the evidence, Mother had no concrete plans on how to accommodate the children if they were returned. The Department was continuing to work with family members and had alternative options for the children if the family placement was not acceptable. This factor weighs in favor of termination.

### 3. Summary

Applying the high standard of evidence required in parental termination cases, we hold that the evidence was sufficient to support the trial court's findings of violations under section 161.001(b)(1)(E). *See In re H.R.M.*, 209 S.W.3d at 108. Legal sufficiency requires this Court to look "at all of the evidence in the light most favorable to the finding to determine whether a reasonable finder of fact could have formed a firm belief or conviction that its finding was true." *See In re J.F.C.*, 96 S.W.3d at 266. Factual sufficiency requires that we consider the evidence as such that a reasonable factfinder could have formed a belief that the allegations were true. *In re H.R.M.*, 209 S.W.3d at 108. "We must consider all of the evidence, not just that which favors the verdict." *In re J.P.B.*, 180 S.W.3d at 573. Mother's actions that allowed a registered sex offender to have daily access to her children without her supervision was sufficient evidence to support a finding based on section 161.001(b)(1)(E). *See* TEX. FAM. CODE. ANN. § 161.001(b)(1)(E); s*ee In re J.F.C.*, 96 S.W.3d at 266.

Additionally, regarding the best interest of the children, we find the evidence was sufficient. Not only did Mother place the children in an unsafe environment, after their removal, it was clear the children needed services and help that Mother was unwilling or unable to provide. The trial court gave Mother ample time and opportunity to comply with the family service plan, but based on the testimony, that compliance never came.

The trial court could have found by clear and convincing evidence that the children's best interests would be served by termination. We overrule Mother's second issue.

### III. DE NOVO HEARING

By what we deem to be her second issue, Mother questions if

> the transcript from the previous associate judge's hearing, outside of the record of the district court's *de novo* hearing, yet expressly relied upon by the district court in its 'Final Judgment,' [should] have been moved [sic] into and admitted into evidence at the final *de novo* hearing before being considered by the district court.

#### A. Applicable Law

The family code provides that a trial court may refer to an associate judge "any aspect of a suit over which the court has jurisdiction" under the family code. *In re R.R.*, 537 S.W.3d 621, 622 (Tex. App.—Austin 2017, pet. ref'd) (quoting TEX. FAM. CODE ANN. § 201.005 (West, Westlaw through 2017 1st C.S.)). When a matter is referred to an associate judge, the associate judge may conduct a hearing, hear evidence, make findings of fact, and recommend an order to be rendered. *See* TEX. FAM. CODE ANN. § 201.007 (West, Westlaw through 2017 1st C.S); *see also id.* § 201.2041(West, Westlaw through 2017 1st C.S.) (addressing powers of an associate judge in child-protection cases). When an associate judge makes a recommendation or temporary order, any party may request "a de novo hearing before the referring court," specifying the issues that will be presented to the referring court. *Id.* § 201.015(a), (b) (West, Westlaw through 2017 1st C.S.). In the de novo hearing, which is mandatory when properly requested, "the parties may present witnesses on the issues specified in the request for hearing," and the referring court "may also consider the record from the hearing before the associate judge." *Id.* § 201.015(c); *In re N.V.*, 554 S.W.3d 217, 221 (Tex. App.—Amarillo

17

June 29, 2018, pet. denied).

A de novo hearing "is a new and independent action on those issues raised" in the request for a hearing. *In re. R.R.*, 537 S.W.3d at 622–23. Because a de novo hearing is a new and independent action, "the party with the burden of proof, having prevailed before the associate judge, must still carry [its] burden in a de novo hearing before the referring court." *Id.* at 623.

## B.     Discussion

Mother argues that the transcript was not introduced into evidence as an exhibit at the de novo hearing and, therefore, could not have been considered by the referring court in making its determination. However, section 201.015(c) authorizes the referring court to consider the record from the hearing before the associate judge in making its determination and does not state that the referring court is only allowed to review the transcript when the Department offers it into evidence. *See* TEX. FAM. CODE ANN. § 201.015(c). In fact, section 201.015(c) "clearly vests the trial court with the authority to consider the record of the hearing before the associate judge." *In re R.S.-T.*, 522 S.W.3d 92, 108 (Tex. App.—San Antonio 2017, no pet.). Additionally, Mother did not object to the referring court reviewing the record from the hearing before the associate judge.

During the de novo hearing, the trial court asked if there was any additional evidence that needed to be developed since the hearing before the associate judge. There had been a change in placement for Child 2, and the trial court allowed testimony regarding the circumstances around the change in placement and how Child 2 seemed to be doing in her new placement. In its final order, the referring court stated that it considered the arguments of counsel and its review of the "transcript of the trial before

the Associate Judge" in making its determination to terminate Mother's rights.[3]

"In order to preserve a complaint for appellate review, the complaint must be made by a timely request, objection, or motion and with sufficient specificity to notify the district court of the complaint and obtain an adverse ruling." TEX. R. APP. P. 33.1(a); *see also In re C.O.*, No. 04-17-00175-CV, 2018 WL 1733178, *3 (Tex. App.—San Antonio April 11, 2018, no pet.) (mem. op.). Otherwise, the complained-of error is waived and cannot be appealed. Here, as pointed out above, Mother failed to object to the district court's reliance on the reporter's record from the underlying hearing [4] or argue that the Department failed to produce any evidence at the de novo hearing. Accordingly, we hold Mother cannot complain for the first time on appeal that the district court's reliance on the reporter's record from the associate judge's hearing was improper. *See In re C.O.*, 2018 WL 1733178 at *3.

We hold the trial court did not err by relying on the transcript from the previous hearing when determining its termination order.[5] We overrule Mother's first issue.

---

[3] The transcript of the trial before the associate judge is part of the appellate record. Therefore, this Court can review the evidence the referring court had before it as part of this appeal.

[4] The referring court told the parties it was going to review the transcript from the trial before the associate judge in order to make its decision regarding termination of Mother's rights. Mother's counsel made no objection to the trial court's review of the record.

[5] Mother filed with this Court an "objection to and motion to strike the supplmental [sic] reporter's record" which contained the transcript from the trial in front of the associate judge. Although Mother claims the record was created after the final de novo hearing and was related to a hearing in 2017, the supplemental reporter's record shows it to be a transcript of the trial conducted on March 27, 2018 before the associate judge. The referring court held its de novo hearing on May 4, 2018. The reporter's record was not in the referring court's possession at the time due to a disagreement over payment. The court reporter certified the transcript of the previous trial on May 18, 2018 and the referring court did not issue a ruling on the parental termination until June 6, 2018. Mother raises a similar argument in her motion as she did in her brief to this Court. Therefore, based on the reasons stated in this opinion, this motion is denied.

## IV. CONCLUSION

The judgment of the trial court is affirmed.

GINA M. BENAVIDES,
Justice

Delivered and filed the
1st day of November, 2018.